UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION at LEXINGTON

CIVIL ACTION NO. 13-cv-143-KSF

PENSION BENEFIT GUARANTY
CORPORATION                                              PLAINTIFF

v.                               **OPINION & ORDER**

KENTUCKY BANCSHARES, INC.                            DEFENDANT

\* \* \* \* \* \* \* \* \* \* \*

The plaintiff, Pension Benefit Guaranty Corporation ("PBGC"), has filed this action pursuant the Employment Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001-1461 ("ERISA"), to enforce the provisions of Title IV of ERISA and to enforce a final agency determination that violations of Title IV have occurred in connection with the defendant's termination of a single-employer, defined-benefit pension plan. Currently before the Court are the parties' cross-motions for summary judgment [DE ##19, 22]. This matter is fully briefed and is ripe for review.

I.      **STATUTORY AND REGULATORY BACKGROUND**

       A.      **THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974**

Congress enacted ERISA in 1974 "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by termination of pension plans before sufficient funds [had] been accumulated in the plans." *Pension Benefit Guaranty Corporation v. R.A. Gray & Co.*, 467 U.S. 717, 720 (1984)(citing *Nachman Corp. v. Pension Benefit Guaranty Corporation*, 446 U.S. 359, 361-62 (1980)). *See also* 29 U.S.C. § 1001(a)(including among ERISA's

congressional findings "that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits"). ERISA is divided into three principal subchapters. Subchapter 1 addresses the protection of employee pension benefit rights by establishing "rules for reporting and disclosure, participation and vesting, funding of pension trust, fiduciary responsibility, and administration and enforcement." *A-T-O, Inc. v. Pension Benefit Guaranty Corporation*, 634 F.2d 1013, 1014 (6th Cir. 1980); *see* 29 U.S.C. §§ 1001-1191. Subchapter 2 establishes the enforcement jurisdiction of various federal departments and agencies over the statute's provisions, as well as creates the joint pension task force. *See* 29 U.S.C. §§ 1201-1242. Finally, Subchapter 3 provides insurance coverage for pension benefit plans. *See* 29 U.S.C. §§ 1301-1461.

Subchapter 3 is the "key to the congressional plan," *Page v. Pension Benefit Guaranty Corp.*, 968 F.2d 1310, 1311 (D.C. Cir. 1992), designed to guarantee that "if a worker has been promised a defined pension benefit upon retirement - and if he has fulfilled whatever conditions are required to obtain a vested benefit - he actually will receive it." *R.A. Gray & Co.*, 467 U.S. at 720. In order to ensure this guarantee, Congress created the Pension Benefit Guaranty Corporation ("PBGC"), "a wholly-owned United States government corporation within the Department of Labor, modeled after the Federal Deposit Insurance Company." *Pension Benefit Guaranty Corp. v. LTV Corp.*, 496 U.S. 633, 636-67 (1990). PBGC is vested with the authority to enforce and administer a mandatory Government insurance program that currently protects the pension benefits of millions of private-sector American workers who participate in defined benefit pension plans. *See generally* 29 U.S.C. § 1302.

### B. STANDARD TERMINATIONS

One of PBGC's principal operations is to monitor, and under limited circumstances, initiate the termination of defined benefit plans where the plans have insufficient assets to satisfy their obligations to participants. In the case of an underfunded pension plan termination, PBGC "becomes the trustee of the plan, taking over the plan's assets and liabilities." *LTV Corp.*, 496 U.S. at 637. Once trustee, PBGC then merges the remaining assets of the terminated plan with its own funds to "ensure payment of most of the remaining 'non-forfeitable benefits.'" 29 U.S.C. § 1301(a)(8), 1322(a) & (b); *LTV Corp.*, 496 U.S. at 638. PBGC then pays the benefits according to congressionally prescribed limits. 29 U.S.C. § 1322(b)(3)(B).

This case, however, does not involve an involuntary termination. Rather, the defendant, Kentucky Bancshares, Inc. ("Kentucky Bancshares"), performed a voluntary "standard termination" under 29 U.S.C. § 1341(b). A standard termination is appropriate when the pension plan has sufficient assets to pay all of a pension plan's benefit liabilities. Standard termination procedures "are exhaustive, setting detailed rules" for all phases of the process. *See Beck v. PACE Int'l Union*, 551 U.S. 96, 102-03 (2007); *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 446 (1999). In a standard termination, the Plan administrator is required to provide notice to plan participants of the intent to terminate the plan (the "NOIT"). 29 U.S.C. § 4041(a)(2), and (b)(1)(A); 29 C.F.R. § 4041.23. The NOIT serves as written notice to plan participants of the intended plan termination and includes a proposed date of termination as well as notice of plan benefits, explaining the benefits owed to each affected party. *See* 29 U.S.C.§ 1341(a)(2), (b)(2)(B); 29 C.F.R. §§ 4041.23, 4041.24. The termination date may be changed by the Plan administrator under certain circumstances not applicable here. 29 U.S.C. § 1348(a)(1).

3

Before distribution of any assets, a Standard Termination Notice-PBGC Form 500 ("Form 500") must be filed with PBGC, stating the intent to terminate the plan, as well as the proposed date of plan termination, and providing, *inter alia*, detailed information regarding plan assets and benefit liabilities. *See* 29 U.S.C. § 1341(b)(2)(A); 29 C.F.R. 4041.25. Form 500 provides detailed instructions for completing the standard termination process.

Upon receipt of the Form 500, PBGC has 60 days to make the statutorily required determination that "there is no reason to believe" that the plan is not sufficient for benefit liabilities based upon its review of the required documentation from the plan administrator, the plan's actuary or other affected parties, including an attestation that the plan is sufficient for benefit liabilities (the "60 Day Review Period"). 29 U.S.C. § 1341(b)(2)(C); 29 C.F.R. § 4041.25. In the absence of a finding from PBGC that the plan is not sufficient for all benefit liabilities, the plan administrator must distribute plan assets in accordance with Title IV of ERISA within a specified time period. 29 U.S.C. § 1341(b)(2)(D) and (B)(3); 29 C.F.R. § 4041.28. When distributing assets in a standard termination, the plan's administrator must either (1) purchase "irrevocable commitments" (*i.e.*, annuities) from a private insurer to satisfy all benefit liabilities, 29 U.S.C. § 1341(b)(3)(A)(i), or (2) provide an alternative form of distribution (*e.g.*, lump sum payment) "in accordance with the provisions of the plan and any applicable regulations. . . ." 29 U.S.C. § 1341(b)(3)(A)(ii). To determine the value of a lump sum distribution, the regulations set out a two-step process. First, the amount of the monthly pension benefit must be calculated in accordance with plan provisions. Then, the projected stream of future benefit payments must be discounted to present value, as of the date of distribution, 29 C.F.R. § 4041.28(c)(2), using assumptions for mortality and interest specified in the plan. *See* 26 U.S.C. § 401(a)(25). The interest rate used to discount to present value are

inversely related to the amount of the lump sum (*i.e.*, the greater the interest rate, the lower the lump sum).

Thirty days after the last distribution of plan assets, a Post-Distribution Certification for Standard Termination-PBGC Form 501 ("Form 501") must be filed with PBGC, attesting that all benefits under the plan have been paid in accordance with Title IV. *See* 29 U.S.C. § 1341(b)(3)(B); 29 C.F.R. 4041.29. Following the filing of Form 501, PBGC continues to have authority regarding matters relating to the plan. 29 U.S.C. § 1341(b)(4). Additionally, PBGC is required by 29 U.S.C.§ 1303(a) to audit a statistically significant number of standard terminations to determine, *inter alia*, if affected parties have received their benefits. 29 U.S.C. § 1303(a). These determinations are subject to PBGC's administrative review procedures. 29 C.F.R. § 4003.1(b)(3)(iii).

**C.     OTHER RELEVANT STATUTORY AND REGULATORY PROVISIONS**

In addition to ERISA, other statutory and regulatory provisions are relevant to the standard termination at issue in this case. The first is § 401(a) of the Internal Revenue Code ("I.R.C."), 26 U.S.C . § 401(a). Under this statute, a pension plan must comply with the requirements of I.R.C. § 411 to qualify for favorable tax treatment. To obtain advanced assurance that a pension plan satisfies the I.R.C. qualification requirements under 26 U.S.C. § 401, a taxpayer may request a determination letter that the plan provisions meet qualification requirements. *See* 26 C.F.R. § 601.201(a)(3), (c)(5), and (o); IRS Publication 794. While the determination letter may speak to the issue of tax qualification, it does not make any "determination regarding the effect of other federal or local statutes. 26 C.F.R. 601.201(c)(5).

To be tax qualified under the I.R.C., except as provided by I.R.C. § 417, a plan must provide vested participants who do not die before their "annuity starting date" their accrued benefits in the

form of a qualified joint and survivor annuity ("QJSA"). 26 U.S.C. § 401(a)(11). Under I.R.C. § 417, they must also allow a participant to waive the QJSA in lieu of another form of benefit if the plan provides for other optional forms of benefits. 26 C.F.R. §1.401(a)-11(a)(1)(II); 26 U.S.C. § 417(a)(1)(A)(i). A participant may elect to waive a QJSA in lieu of another form of benefit only during the 180-day period ending on the participant's "annuity starting date," 26 U.S.C. § 417(a)(1) and (6). If the participant elects a lump sum in lieu of an annuity, the annuity start date is the date on which all events have occurred that entitle the participant to a lump sum. The annuity starting date for an annuity is the first date of the first period that a benefit is payable as an annuity. *See* 26 U.S.C. § 417(f)(2). The date is determined not by the purchase of the annuity, but by payments under the annuity contract. *Id*. As the regulations explain,

> . . . benefits under 401(a)(11) and 417 may not be eliminated or reduced because the plan uses annuity contracts to provide benefits merely because . . . such contracts are distributed upon plan termination. Thus, the requirement of sections 401(a)(11) and 417 [requiring the option to waive the QJSA] apply to payments under the annuity contracts, not to the distribution of the contracts.

26 C.F.R. § 1.401(a)-20, Q&A-2. Thus, any election to waive a QJSA benefit must be made within 180 days of being able to commence payment under the annuity contract, not within 180 days of purchasing the annuity contract.

Section 411(a) establishes a floor for lump sum valuations, and provides that the present value of lump sum benefits shall not be less than the present value calculated using the specified "applicable mortality table" and the "applicable interest rate" assumptions." *See* 26 U.S.C. §§ 411(a)(11)(B); 417(e)(3). Over time, these specific assumptions have changed. Most recently, for the plan years beginning after December 31, 2007, the Pension Protection Act of 2006 (the "PPA"), Pub.L.No. 109-280, 120 Stat. 780 (2006), amended the I.R.C. to change the "applicable interest rate"

6

from the annual rate of interest on 30-year Treasury securities (prescribed by GATT, Retirement Protection Act of 1994 within the Uruguay Round Agreements Act, Pub.L 103-465,§ 767, 109 Stat. 4809, 5039-40 (1994)), to the adjusted first, second, and third segment rates derived from a corporate bond yield curve. PPA § 302(b); 26 U.S.C. § 417(e)(3); *see also*, 29 U.S.C. § 205(g). The PPA also replaced the 1994 GAR Mortality Table as the "applicable mortality table" used for lump sum calculations, to a mortality table under I.R.C. § 430(h)(3)(A). 26 U.S.C. § 417(e)(3)(B). Under the PPA, the "applicable mortality table" for distributions in 2009 was the PPA 2009 Mortality Table. *See generally*, IRS Notice 2008-85, 2008-42 I.R.B. 905 (Oct. 20, 2008).

Recognizing that required PPA amendments might reduce accrued benefits under some plans, the PPA provided that plans would not violate I.R.C. § 411(d)(6) and ERISA section 204(g) when making amendments to comply with PPA's changes, if those amendments were made before the last day of the first year beginning after January 1, 2009, and conformed to plan operations. PPA § 1107(a). However, the PPA did not provide for relief for violations of Title IV of ERISA.

Also relevant to this action is Section 411(d)(6) of the I.R.C. which prohibits plan amendments that reduce accrued benefits. It also prohibits the elimination of optional forms of benefits, such as lump sums. Such prohibited reductions include the elimination of optional benefit forms, at plan termination, through the purchase of deferred annuities that do not include optional benefit forms available under the plan. 26 CF.R. 1.411(d)-(4) Q&A2(a)(3)(ii)(A) and (B), Example 2. This prohibition, however, does not extend to the purchase of immediate annuities where a plan participant has elected to immediately receive a payment of his benefit in such form in lieu of a lump sum; thus extinguishing the obligation to protect optional forms. A valid election can only be made

7

180 days prior to the date payments will start under the purchased annuity. 26 U.S.C. § 417(a)(1) and (6).

## II. FACTUAL AND PROCEDURAL BACKGROUND

The facts in this matter are largely undisputed. Kentucky Bancshares is a bank holding company for Kentucky Bank. Kentucky Bancshares is the contributing sponsor of Kentucky Bancshares, Inc. Retirement Plan and Trust (the "Plan") within the meaning of 29 U.S.C. § 1301(a)(13). Kentucky Bancshares is also the Plan Administrator within the meaning of 29 U.S.C. § 1301(a)(13). The Plan is a single-employer, defined benefit pension plan covered under Title IV of ERISA. 29 U.S.C. § 1321.

The Plan, previously known as the Bourbon Agricultural Deposit Bank Retirement Plan and later as the Bourbon Bancshares, Inc. Retirement Plan and Trust, was adopted by Kentucky Bancshares as of January 1, 1972. On October 15, 2008, the Plan administrator issued a NOIT to participants and beneficiaries in accordance with 29 U.S.C. § 1341(a)(2), with a proposed termination date of December 31, 2008. Administrative Record, hereinafter "AR," 328-29, DE # 6. On April 14, 2009, PBGC received Form 500-Standard Termination Notice for the Plan, indicating a proposed termination date of December 31, 2008. AR 1-5. On July 10, 2009, Kentucky Bancshares purchased a nonparticipating single premium group annuity contract from United of Omaha Life Insurance Company ("Annuity Contract"), which did not include the option to pay future benefits in the form of a lump sum. AR 330-43. The Annuity Contract required payment of benefits on the Annuity Start Date. AR 333. For Plan participants not yet in pay status that did not elect lump sums, that date would occur upon their reaching the normal retirement age of 65 under the Plan. AR 368, 824, 826, 830, 832, 834.

8

Pursuant to the terms of the Plan, participants could elect a benefit in the form of a lump sum payment that was the "Actuarial Equivalent" of the normal benefit payable under the Plan. As of December 31, 2008, for purposes of calculating optional forms of benefit - including lump sums - the Plan defined Actuarial Equivalent of a benefit form as the benefit resulting in a higher value when calculated using either (1) the annual interest rate based on 30-year U.S. Treasury securities for the second month before the Plan Year in which the annuity start date occurs and the 94 GAR mortality table, or (2) the interest rate specified in the Plan (7%) and the 1984 Unisex Pension mortality table. AR 263.

On February 24, 2009, the Plan was amended to change the assumptions used for calculating lump sums in accordance with the PPA (the "PPA Amendment"). Specifically, §§ 10.2 and 10.3 of the Plan were amended to provide that:

> 10.2 For purposes of the Plan's provisions relating to the calculation of the present value of a benefit payment that is subject to [Internal Revenue] Code Section 417(e), any provision prescribing the use of the annual rate of interest on 30-year U.S. Treasury securities shall be implemented by instead using the rate of interest determined by applicable interest rate described by [Internal Revenue] Code Section 417(e) after its amendment by PPA [the Pension Protection Act of 2006, ("PPA"), P.L. 109-280, § 302, 120 Stat. 780 (2006)("PPA")]. Specifically, the applicable interest rate shall be the adjusted first, second, and third segment rates applied under the rules similar to the rules of [Internal Revenue] Code Section 430(h)(2)(C) for the month before the date of the distribution or such other time as the Secretary of the Treasury may by regulations prescribe. . . .
>
> 10.3 For purposes of the Plan's provision relating to the calculation of the present value of a benefit payment that is subject to [Internal Revenue] Code Section 417(e), any provision directly or indirectly prescribing the use of the mortality table described in Revenue Ruling 2001-62 shall be amended to prescribe the use of the mortality table described in Revenue Ruling 2007-67.

AR 679.

On July 10, 2009, Kentucky Bancshares purchased a nonparticipating single premium group annuity contract from United of Omaha Life Insurance Company, which did not include the option to pay future benefits in the form of a lump sum. AR 330-43. The Annuity Contract required payment of benefits on the Annuity Start Date. AR 333. For Plan participants not yet in pay status that did not elect lump sums, the Annuity Start Date would occur upon their reaching the normal retirement age of 64 under the Plan. AR 368, 824, 826, 828, 830, 832, 834.

On November 13, 2009, the Plan administrator filed Form 501 - Post Distribution Certifications with PBGC that certified, *inter alia*, that all benefits payable under the Plan were calculated correctly in accordance with ERISA's provisions and regulations, and that all benefit liabilities under the Plan were satisfied. AR 7, 8. By a letter dated January 21, 2010, PBGC notified Kentucky Bancshares that the Plan's termination had been selected for audit. AR 9. A revised Form 501 was submitted to PBGC on February 26, 2010 amending the value of benefits distributed. AR 33.

On April 8, 2011, PBGC issued an initial determination letter ("Initial Determination") with respect to its audit. AR 772-74. As set out in the Initial Determination, PBGC found that: (1) the PPA Amendment adopting the PPA specified interest rates and mortality table (together the "PPA Assumptions") after the date of Plan termination decreased benefits in violation of 29 C.F.R. § 4041.8, as the amendment was not necessary to meet qualifications under I.R.C. § 401; and (2) the Annuity Contract did not offer a lump sum payment option for future benefit payments, thereby violating I.R.C. § 411(d)(6). AR 772-74. As a result, PBGC determined that Kentucky Bancshares was required to recalculate the lump sum distributions made from the Plan, and pay the highest benefit value (plus interest from the date of the initial payment) calculating using: (a) the 30-year

10

Treasury rate in effect for November 2008 (4%) and the 94 GAR mortality table; (b) UP 1984 (7%) and the pre- and post-mortality table (1984 Unisex Pension mortality table); and (c) the November 2008 PPA segment rates in effect for the 2009 Plan year and the 2009 applicable mortality table. AR 772-74, AR 263. The Initial Determination also required that Kentucky Bancshares amend the Annuity Contract to provide participants the option to elect a lump sum distribution at retirement. AR 772-74.

Kentucky Bancshares requested reconsideration of the Initial Determination. AR 779-837. In support of its request, Kentucky Bancshares contested PBGC's determination that the Plan's post-termination interest rate and mortality table amendments violated Title IV of ERISA and the Plan provisions in effect on the Plan's termination date. *Id.* Kentucky Bancshares argued that its actions and written documents support a *de facto* amendment to the Plan prior to the termination date. Kentucky Bancshares also argued that the PPA amendment was necessary for I.R.C. qualifications, and therefore exempted it from 29 C.F.R. § 4041.8's prohibition on post-termination amendments. Kentucky Bancshares argued that compliance with PPA provided relief from Title IV of ERISA. Finally, Kentucky Bancshares contested PBGC's determination that the Annuity Contract was required to include the option of future benefit payments in lump sum form. AR 785.

PBGC issued its final determination ("Final Determination") on May 9, 2012. AR 838-41. The Final Determination concluded that Kentucky Bancshares' arguments on reconsideration provided no defense to PBGC's Initial Determination because: (1) the Plan was not amended to adopt the PPA assumptions until the PPA Amendment (February 24, 2009); (2) the PPA Amendment was adopted after the date of the Plan termination (December 31, 2008), decreased benefits for participants and beneficiaries who elected lump sums, and was unnecessary to meet I.R.C.'s tax

qualification requirements, thereby violating 29 C.F.R. § 4041.8; (3) PPA provided no relief under Title IV of ERISA; and (4) failure to provide for a lump sum form of benefit payment in the Annuity Contract violated I.R.C. § 411(d)(6), resulting in a failure to pay all benefit liabilities under the Plan in accordance with 29 U.S.C. § 1341. AR 838-41. Thereafter, on May 23, 2013, PBGC filed this Complaint seeking, *inter alia*, judgment in its favor and against Kentucky Bancshares, enforcing PBGC's Final Determination and requiring Kentucky Bancshares to comply with the provisions of the Plan and Title IV of ERISA [DE #1]. This court has jurisdiction over this matter under 29 U.S.C. § 1303(e)(3)

### III. STANDARD OF REVIEW

In the Joint Report of Parties [DE #12] filed on September 13, 2013, the parties agreed that the standard of review in this action is set forth by the Administrative Procedure Act in 5 U.S.C. § 706(2)(A), which provides:

> The reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. . . In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

The court's review under the arbitrary and capricious standard is narrow. *See Sierra Club v. Slater*, 120 F.3d 623, 633 (6th Cir. 1997). Under this standard, the court is limited to consideration of the agency's administrative record, and may not substitute its judgment for that of the agency. *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Northeast Ohio Reg'l Sewer Dist v. United States E.P.A.*, 411 F.3d 726, 732

(6th Cir. 2005); *Simms v. Nat'l Highway Traffic Safety Administration*, 45 F.3d 999, 1003 (6th Cir. 1995).

The parties further agree that to the extent that PBGC's interpretation of a statutory provision under Title IV of ERISA is at issue, *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984), and its progeny supplies the legal framework for determining the extent to which the interpretation is subject to deference. Under *Chevron*, if Congress has not spoken directly to the issue, then the agency's interpretation of the statute it administers is entitled to deference. *Chevron*, 467 U.S. at 837. The "court need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading [the court] would have reached if the question initially had arisen in a judicial proceeding." *Jewish Hospital, Inc. v. Secretary of Health & Human Servs.*, 19 F.3d 270, 273-74 (6th Cir. 1994). The Court must afford the agency's construction deference unless "arbitrary, capricious, or manifestly, contrary to the statute." *Battle Creek Health Sys. v. Leavitt*, 498 F.3d 401, 408-09 (6th Cir. 2007). An agency's interpretation of its own regulations is entitled to even more deference. *Id*. The agency's interpretation of its own regulations "must be given controlling weight unless it is 'plainly erroneous or inconsistent with the regulation.'" *Id*. (quoting *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

IV.   **ANALYSIS**

    **(A)   WHETHER PBGC WAS ARBITRARY AND CAPRICIOUS IN ITS DECISION THAT THE PPA AMENDMENT VIOLATED APPLICABLE LAW**

The following facts are not disputed. The Plan terminated on December 31, 2008. The PPA Amendment was not adopted until February 24, 2009, well after the Plan termination date. The PPA Amendment provided lower lump sums than those calculated using the previously applicable

13

mortality table and interest rate assumptions. Reducing accrued benefits post-termination is in violation of PBGC's regulation at 29 C.F.R. § 4041.8. Nevertheless, Kentucky Bancshares argues that PBGC's Final Determination with respect to the PPA Amendment was arbitrary and capricious, and not in accordance with law for the following reasons:

(1) Kentucky Bancshares *de facto* amended the Plan to comply with the PPA prior to Plan termination;

(2) The PPA Amendment fell within 29 C.F.R. § 4041.8's exception allowing post-termination amendments that reduce accrued benefits if they are necessary for tax qualification. Kentucky Bancshares argues that this is so because the Plan paid two participants their lump sums calculated using PPA Assumptions before the Plan termination date, thereby establishing an operating plan practice to which the PPA Amendment had to conform; and

(3) PPA § 1107 expressly demonstrated Congress' intent to authorize post termination plan amendments that reduce accrued benefits.

The Court turns first to Kentucky Bancshares' argument that the Plan had effected a *de facto* amendment prior to its termination. According to Kentucky Bancshares, the *de facto* amendment was the result of the following actions: (1) Kentucky Bancshares receipt of a list of PPA changes from The Standard (the Plan's record keeper and actuary) that it would use an ongoing Plan administration, including a notation that the actuarial assumptions used to "determine minimum lump-sum distributions" had changed; (2) e-mails between Kentucky Bancshares' Director of Special Projects and The Standard; (3) a presentation made to Kentucky Bancshares' management by The Standard explaining PPA's changes (including those made to minimum lump-sum calculations); and (4) the subsequent payment of lump sums calculated using PPA Assumptions to two Plan participants in 2008. AR 789, 780-81, 787-90.

14

None of these actions, however, satisfies ERISA's requirement that all employee benefit plans be established and maintained pursuant to a written instrument, executed by a party who is authorized to effect such an amendment. 29 U.S.C. § 1102(a)(1); *Bellino v. Schlumberger Technologies, Inc.*, 944 F.2d 26, 33 n. 8 (1st Cir. 1991)(concluding that letter purporting to explain a change to a plan was not a valid plan amendment); *Pizlo v. Bethlehem Steel Corp.*, 884 F.2d 116, 120 (4th Cir. 1989)(affirming the district court's determination that modification of a pension plan by informal and unauthorized amendment was impermissible pursuant to 29 U.S.C. § 1102(a)(1)). The purpose of this requirement is to ensure that "every employee may, on examining the plan document, determine exactly what his rights and obligations are under the plan." *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995). While plan sponsors are generally free under ERISA to adopt, modify, or terminate pension plans, a written document is clearly required. The Sixth Circuit has consistently refused " . . . to sanction informal 'plans' or plan 'amendments' - whether oral or written - [as doing so] would leave the law of employee benefits in a state of uncertainty and would create disincentives for employers to offer benefits in the first place." *Sprague v. General Motors Corp.*, 133 F.3d 388, 403 (6th Cir. 1998).

Kentucky Bancshares has failed to cite any binding precedent in support of its position that a *de facto* amendment occurred. ERISA is clear - a written amendment is required. Accordingly, the Court finds that PBGC's Final Determination that there was no *de facto* amendment to the Plan was not arbitrary and capricious, and was in accord with the law.

Next, the Court turns to Kentucky Bancshares' argument that the Plan Amendment of February 24, 2009 was required for plan tax qualification. Kentucky Bancshares does not dispute that I.R.C. § 417(e) only sets a floor for valuing lump sum or that the I.R.C. does not prohibit a plan

15

from paying a larger lump sum if required by another statutory provision or a provision of the plan. 26 U.S.C. § 417(e). As PBGC argues, the I.R.S. clearly allows plan sponsors that had implemented PPA Assumptions to return to the previous mortality table and interest rate assumptions without risking disqualification. *See* I.R.S. Notice 2008-30 (allowing amendments providing the greater of lump sums calculating using GATT or PPA Assumptions, with no restriction for any prior payments calculated using PPA Assumptions). The fact that Kentucky Bancshares may have calculated and paid certain benefits before the Plan's termination date using PPA Assumptions is irrelevant. The Plan could have specified that the Plan must pay the greater of the PPA interest rates and the 30-year Treasury rates (GATT rates), and made supplemental payments as necessary to any affected participants, thereby insuring that the pre-termination lump sum payments complied with the amendment. Thus, PBGC's finding that the PPA Amendment, which eliminated the use of 30-year Treasury rates for calculating benefits, was not necessary for tax qualification, was not arbitrary or capricious, and was in accord with relevant law.

Nor was the PPA Amendment sanctioned by PPA § 1107 as Kentucky Bancshares argues. PPA § 1107 amended the I.R.C., but says nothing about Title IV's prohibition against benefit reducing, post-termination amendments. Title IV clearly requires the payment of all benefit liabilities as determined on the date of plan termination. 29 U.S.C. § 1341(b)(1)(D). Moreover, PBGC's regulation, 29 C.F.R. § 4041.8, prohibits post-termination reductions in benefits. Both prohibitions are clear, and PBGC was not arbitrary or capricious in determining that PPA § 1107 did not authorize the post-termination reduction in benefits. For all these reasons, the Court finds that PBGC's determination that Kentucky Bancshares did not adopt the PPA Amendment until after the date of termination in violation of Title IV and 29 U.S.C. § 4041.8 was not arbitrary and capricious.

Consequently, Kentucky Bancshares must comply with PBGC's determination that it must recalculate the participants' lump sum distributions using the GATT assumptions (i.e., the 30-year Treasury rate and the 94 GAR mortality table), including a reasonable rate of interest from the date of the initial determination to the date the additional benefits will be paid.

**(B) WHETHER THE OPTIONAL LUMP SUM FORM OF BENEFITS MUST BE PROVIDED IN THE ANNUITY CONTRACTS PURCHASED FOR FUTURE BENEFIT PAYMENTS**

In its Final Determination, PBGC also concluded that Kentucky Bancshares' failure to provide optional forms of benefits in the Annuity Contract purchased for future benefit payments violated I.R.C. § 411(d)(6). This section prohibits plan amendments that reduce accrued benefits, including the elimination of optional forms of benefit. 26 U.S.C. § 411(d)(6)(B)(ii). Kentucky Bancshares argues that the Annuity Contract purchased in this case does not need to include lump sum options for Plan participants not currently in pay status. According to Kentucky Bancshares, the six participants who had not reached retirement age on the Plan termination date elected payment in the form of an annuity. It contends that the purchase of the Annuity Contracts itself "constituted payment of a benefit" to Plan participants in a form elected by the participant, and thus no lump sum benefit option was required. For the reasons below, PBGC was correct in rejecting Kentucky Bancshares' reasoning.

Under the relevant regulations, an optional form of benefit must be preserved until a plan participant becomes eligible to receive plan benefits and elect any available optional forms of benefit. *See* 26 C.F.R. § 1.411(d)-(4) Q & A 2(a)(2)(ii) & (iv). Thus, on plan termination, optional forms of benefit may not be eliminated through the purchase of deferred annuity contracts for participants who are not yet eligible to receive retirement benefits. 26 C.F.R. § 1.411(d)-(4) Q & A

17

2(a)(3)(ii)(A) & (B), Example 2. Additionally, such participants are unable to make a valid election to receive an optional form of benefit until not more than 180 days before an annuity start date, the first day a participant is eligible to begin receiving pension benefits. 26 U.S.C. § 417(a)(6) & (f)(2); 29 U.S.C. § 1055(c)(1) & (7). Under these statutes and rules, the purchase of an annuity contract to be held for future payment to a participant that has not reached retirement age does not constitute "payment of a benefit" at the time of purchase, and, as PBGC found, may not serve to eliminate future election of a lump sum optional form of benefit.

As a result, the six Plan participants for whom Kentucky Bancshares purchased a deferred annuity have not yet made a valid benefit distribution election. By failing to preserve the lump sum payment as an optional form for those participants that had not yet reached retirement age, Kentucky Bancshares has violated I.R.C. § 411(d)(6). Accordingly, PBGC's determination that the Annuity Contract violated I.R.C. § 411(d)(6), resulting in a failure to pay all benefit liabilities under the Plan in accordance with 29 U.S.C. § 1341, was neither arbitrary nor capricious. Consequently, Kentucky Bancshares must comply with PBGC's determination that it must amend the Annuity Contract to provide the lump sum option for Plan participants not currently in pay status.

## V. CONCLUSION

For the reasons set forth above, the Court, being fully and sufficiently advised, hereby **ORDERS** as follows:

(1) Kentucky Bancshares' motion for summary judgment [DE #22] is **DENIED**;

(2) Pension Benefit Guaranty Corporation's motion for summary judgment [DE #19] is **GRANTED**; and summary judgment will be entered in favor of Pension Benefit Guaranty Corporation;

(3) Kentucky Bancshares must comply with Pension Benefit Guaranty Corporation's Final Determination as well as the provisions of Title IV of the Employee Retirement Income Security Act of 1974 and all applicable regulations;

(4) Counsel for PBGC shall **FILE** a brief in support of its claim for attorneys' fees and costs **NO LATER THAN APRIL 7, 2014**. A response and reply may be filed in accordance with the Local Rules; and

(?) This matter is **DISMISSED** and **STRICKEN** from the active docket.

This March 17, 2014.

KAREN K. CALDWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY

for Karl S. Forester, Senior Judge